## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **TRANSPERFECT TRANSLATIONS, INC.** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civ. No. 4:08-cv-3499** |
| **BRETT J. LESLIE,** | § § § | |
| **Defendant.** | § § | |

## ORDER

Pending before the Court is Plaintiff TransPerfect Translations, Inc.'s ("TransPerfect") Motion for a Preliminary Injunction. (Doc. No. 1.) After considering the parties' arguments and the relevant law, the Court finds that TransPerfect's Motion should be granted in part and denied in part.

### I.    BACKGROUND

#### A. History

This suit involves an alleged breach of a covenant not to compete. On November 17, 2008, Defendant Brett J. Leslie gave notice that he was leaving his job at TransPerfect to go work for a direct competitor, Merrill Brink International ("Merrill") in its Chicago office. TransPerfect is a translation firm, offering services to individuals and businesses, with offices located in Houston, Chicago, and other national and international locations. (Doc. No. 1, Ex. A, ¶ 10.)

Prior to working for TransPerfect, Leslie worked as a territory manager and salesman for a liquor distributorship in Florida, where he managed 25 retailer accounts.

(Dec. 4, 2008, Mtn. Hr'g; Pl. Ex. 5.) TransPerfect hired Leslie in July 2006 as a Strategic

Business Manager in TransPerfect's Atlanta, Georgia office. (Doc. No. 1, Ex. A, ¶ 11.)

Leslie executed a confidentiality agreement with TransPerfect upon his hiring in Georgia.

(Doc. No. 1, Ex. A, ¶ 14.) Obarski testified that this Agreement is signed by all

salespeople at TransPerfect. (Dec. 4, 2008, Mtn. Hr'g.) Under the Agreement,

TransPerfect explained that it would provide confidential information:

> Upon execution of this Agreement TransPerfect will have to
> disclose, and may have already disclosed to [Leslie] certain
> Confidential Information …. The Confidential Information is not
> generally known to others and could have economic value if
> disclosed to others and/or used by [Leslie], directly or indirectly in
> competition with TransPerfect. [Leslie] has a duty, both
> contractual and otherwise, to keep secret and confidential the
> Confidential Information.

(Doc. No. 1, Ex. A, Ex. A ¶ 3.)

In addition, it included a covenant not to compete:

> [Leslie] will not: … [w]hile employed by Transperfect and for a
> period of one year immediately following termination of [Leslie's]
> employment: … compete with the TransPerfect business in any
> activities involved in the provision of goods or services in
> competition with the business. … The restrictions of this paragraph
> … and all of its subparagraphs apply only to products and services
> that are competitive with the products and services of the
> TransPerfect Business and only in the states in which TransPerfect
> maintains U.S. Offices or the countries in which TransPerfect
> maintains foreign offices at the time [Leslie's] employment is
> terminated.

(Doc. No. 1, Ex. A, Ex. A ¶ 8.)

TransPerfect's Employee Handbook includes a section on protecting confidential

information including trade secrets, customer lists, and financial information. In the

Handbook, employees are instructed not to discuss confidential work matters in public

places, to monitor and supervise visitors to TransPerfect, to destroy hard copies of

documents that are not filed or archived, and to secure confidential information in desk

drawers and cabinets. (Pl. Ex. 10, at 14.) Leslie acknowledged that he received the Handbook in July and October 2006. (Pl. Ex. 3, 4.) TransPerfect also maintains a Code of Ethical Conduct that explains that the company has security procedures for laptop computers and explains that its employees sign non-disclosure agreements. (Pl. Ex. 10, at 10.)

In Georgia, Leslie worked directly under Kevin Obarski, a TransPerfect Vice President. (Dec. 4, 2008, Mtn. Hr'g.) Obarski created this position specifically for Leslie, and Obarski described Leslie as his protégé. (*Id*.) Leslie was trained to "cold call," to serve as the lead liaison at trade shows for TransPerfect, and to become the "go-to guy" for TransPerfect's e-Learning subdivision. (*Id*.) Companies have begun using computer-based training for their employees, and TransPerfect's e-Leaning subdivision translates this training into international languages. (*Id*.) Obarski testified that TransPerfect intended to cultivate Leslie's skills so that he would eventually replace Obarski in some capacity, or become a regional director or vice president-level manager. (*Id*.) According to Leslie, Obarski was known as the best cold-caller in the business, and Leslie was allegedly assigned to work under him to improve his cold-calling skills, among other goals. (*Id*.) In his position with Obarski, Leslie allegedly listened in on speakerphone conversations with upper level management and heard discussions regarding company strategy, requests for proposals, and new clients. (*Id*.) Leslie was asked to collect the business plans from several of TransPerfect's U.S. offices, in addition to client names and the value of sales, and compile this information for Obarski. (Dec. 4, 2008, Mtn. Hr'g.) Leslie allegedly had access to a tool that logs current clients. (*Id*.)

Leslie's authority was cabined, however, as he was required to receive approval to sign deals worth more than $10,000. (*Id.*) In his resignation e-mail, Leslie explained that part of the reason he is leaving TransPerfect was that he was looking for a job where there is "no direct management that I speak and report to on a weekly basis," and where he has his own corporate credit card. (Pl. Ex. 21.) Leslie claims that the one upper management meeting he attended in person, he did so by mistake and that, when Obarski made calls, he would ask Leslie to step out of the office. (*Id.*) Leslie characterized his role while working for Obarski as that of a "go-fer" who also sold strategic accounts, specifically TransPerfect's e-Learning and Life Sciences accounts. (*Id.*) Leslie claims that, while at TransPerfect, he spent 80-90 percent of his time selling. In Georgia, he made under $40,000, depending on how much he sold, just above the earnings of a typical account manager/executive, but much less than upper management. (Dec. 4, 2008, Mtn. Hr'g.) According to TransPerfect's website, an account manager sells products to clients and provides customer support. (Def. Ex. 4, 6.) The position requires a bachelor's degree, but no experience, although one or two years of prior sales experience is considered beneficial. (*Id.*) Leslie claims that the account executive position description was comparable to his job at TransPerfect with the exception of his duties involving e-Learning. (*Id.*) In Houston, Leslie allegedly made around $95,000 during the time he worked for TransPerfect, although Obarski testified that, annualizing his last two commission checks, he would have made over $170,000. (*Id.*)

TransPerfect alleges that Leslie received confidential information from several different sources while at the company including general training on selling TransPerfect products and specific training on the e-Learning account. TransPerfect claims that Leslie

received training about using "features and benefits," or techniques that are used to try to win a specific account. (*Id.*) As an example of a feature and benefit, Obarski explained that TransPerfect has received certifications that appeal to certain clients in highly regulated industries, such as the ISO standards (international management standards). This ISO certification is noted in the form signature included at the bottom of e-mails sent by Leslie and another TransPerfect employee. (Pl. Ex. 16, 22.) Leslie acknowledges that he has received training that has increased his earning potential. (*Id.*) He claims, however, that he has retained no paper or electronic information from TransPerfect, and he promptly returned his TransPerfect laptop upon his departure. (Dec. 4, 2008, Mtn. Hr'g.)

Eventually, Leslie spent nearly 80 percent of his time selling e-Learning. (*Id.*) e-Learning is the fastest growing area of TransPerfect's business and its value increased by 300 or 400 percent in 2007. (*Id.*) TransPerfect claims that Leslie was one of two employees trained to market and sell TransPerfect's e-Learning business nationally. At the Motion hearing, Leslie responded that there were six people trained in  e-Learning: three in California and three elsewhere, although he conceded that only three worked at the TransPerfect company rather than at other members of TransPerfect's umbrella organization, and one of those at TransPerfect left the company prior to his departure. (*Id.*) In both his capacity as the trade show liaison and in his general e-Learning duties, Leslie allegedly contacted prospective clients and current TransPerfect clients domestically and abroad who had already purchased other TransPerfect products, to try to sell e-Learning products. (*Id.*) Leslie sold e-Learning to offices in Baltimore, Maryland, as well as New Jersey, Michigan, and Germany, and had some involvement with clients

in California, Tennessee, England, and an existing client in Illinois. (*Id.*) Including sales of e-Learning products, Leslie had approximately three to four contacts with customers or potential customers in Illinois during his time at TransPerfect and had "a couple" of sales calls in Ohio. (*Id.*)[1] In his e-Learning capacity, Leslie was also supervised by Brooke Christian, the Vice President of global sales and marketing for TransPerfect and TransPerfects's sister companies, rather than Obarski. Leslie continued to report to Christian when he moved to Houston and worked under Devon Williams. Although Leslie appeared to have significant authority in the e-Learning business, it was not unlimited: Leslie had to receive permission from Obarski to print 500 business cards indicating that his title at the company was Director, e-Learning services (permission he received). (Dec. 4, 2008, Mtn. Hr'g, Pl. Ex. 17.)

In January 2008, Leslie was promoted to the position of Director of Business Development and transferred to TransPerfect's Houston, Texas office. (Doc. No. 1, Ex. A, ¶ 13.) He allegedly promised TransPerfect he would stay with the company in Houston for three years. (Dec. 4, 2008, Mtn. Hr'g.) There, he was responsible for sales in the Houston regional market that included Louisiana and Arkansas as well as the greater Houston area, but he also continued his e-Learning marketing and sales responsibilities nationally and internationally. (Doc. No. 1, Ex. A, ¶ 13.) He originally supervised two employees, but one left shortly after he arrived. (Dec. 4, 2008, Mtn. Hr'g.) Leslie claimed he spent the majority of his time on the job selling products, and he spent 80 percent of his time on e-Learning and the remainder on local sales. (Dec. 4, 2008, Mtn. Hr'g.)

---

[1] Leslie also tried to sell products in TransPerfect's Life Sciences product line prior to May 2007 in the Southeast and the Midwest, and at some point met with the regional director of marketing and several TransPerfect employees in Illinois. He only sold Life Sciences products to two clients in Memphis, Tennessee. In addition, Leslie had some contact with a current TransPerfect client about selling Life Sciences products. (Dec. 4, 2008, Mtn. Hr'g.)

In his resignation letter, Leslie wrote that he intended to sell for Merrill in its Chicago office starting on December 1, 2008. Leslie allegedly informed TransPerfect that his new job would involve sales in the Life Sciences and e-Learning markets, allegedly in direct competition with TransPerfect's business, especially in its e-Learning market segment. (Doc. No. 1, Ex. A, Ex. A ¶ 26.)

### B. Procedural History

TransPerfect filed suit against Defendant Leslie on November 25, 2008, in state court in Harris County, claiming breach of contract arising from the Agreement containing the covenant not to compete. The suit was timely removed to this Court. TransPerfect asks for a preliminary injunction, until a trial can be held on the merits, prohibiting Leslie from working in any area that directly competes with TransPerfect's business. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II.   PRELIMINARY INJUNCTION

### A. Standard

"A preliminary injunction requires that 'the applicant ... show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.'" *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (quoting *Lake Charles Diesel, Inc. v. General Motors Corp.,* 328 F.3d 192, 195-96 (5th Cir. 2003)). Although the grant or denial of a preliminary injunction rests in the discretion of the trial court, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940), "[w]e have cautioned repeatedly that a preliminary

injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements," *Lake Charles Diesel*, 328 F.3d at 196 (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 2003)).

### B. Analysis

#### 1. Likelihood of Success on the Merits

##### a. Choice of Law

Leslie argues that Georgia law should apply to the analysis of Agreement containing the non-compete covenant because he signed it in Georgia, and it argues the Agreement was void when signed. Leslie argues that, under Georgia law, the non-compete covenant is impermissibly overbroad. He notes that Texas courts will not give effect to a contract void in the state that it was formed. *Shelton v. Marshall*, 16 Tex. 344, 1856 WL 4904 at *7 (1856) (holding that a promissory note executed in connection with the sale of slaves in Mississippi was void because the underlying sale of slaves was void and illegal). In the alternative, Leslie performs a choice of law analysis and contends that Georgia law applies, because the agreement was signed in Georgia, Leslie worked for eighteen months at TransPerfect in Georgia, and the majority of the services were allegedly provided to TransPerfect in Georgia. In addition, Leslie argues that Georgia has a materially greater interest in the litigation because of Georgia's strong public policy interest against non-competition covenants. Finally, Leslie argues that Texas non-compete law violates Georgia public policy. TransPerfect responds that  Texas law applies. It further contends that, in the context of non-compete agreements, Texas courts look to the intention of the parties and deem applicable the forum that holds the contract

legal, valid, and enforceable. *Matlock v. Data Processing Security, Inc.*, 607 S.W.2d 946 (Tex. App.—Forth Worth, writ denied) (applying Texas law even if the contract would have been void when signed in Illinois because the place of performance was in Texas), *aff'd as modified on other grounds*, 618 S.W.2d 327 (Tex. 1981).

District courts sitting in diversity apply the choice-of-law rules of the forum state. *Mayo v. Hartford Life Ins. Co.,* 354 F.3d 400, 403 (5th Cir. 2004); *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). In Texas, contractual choice-of-law provisions are typically enforced, unless the provision violates a fundamental public policy of Texas or the contract bears no reasonable relation to the chosen state. TEX. BUS. & COMM. CODE § 1.301; *Smith v. EMC Corp.*, 393 F.3d at 598; *Exxon Corp. v. Burglin*, 4 F.3d 1294, 1298 n. 5 (5th Cir. 1993); *Access Telecomm., Inc. v. MCI Telcomms. Corp.*, 197 F.3d 694, 705 (5th Cir. 1999) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677-78 (Tex. 1990)).

Here, Section 13 of the Agreement provides that any litigation arising from, or related to, the Agreement "shall be filed and conducted in the state in which Employee last worked for TransPerfect … [and] interpreted in accordance with and governed by the laws of such state." (Doc. No. 1, Ex. A, Ex. A ¶ 13.) Leslie last worked for TransPerfect in Texas and most recently received confidential information from them. Further, the law governing enforcement of non-competition agreements is fundamental policy in Texas. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990), *cert. denied* 498 U.S. 1048 (1990); *In re AutoNation, Inc.*, 228 S.W.3d 663, 669 (Tex. 2007) (declining to overrule *DeSantis* following the enactment of § 15.50 and *Sheshunoff*); *Turfwood v. Underwood*, 952 S.W.2d 641 (Tex. App.—Beaumont 1997, orig. proceeding) (applying

Texas law because Texas has a greater interest in enforcing non-compete covenants in Texas than does Michigan).

A choice-of-law provision will not be applied, however, if another jurisdiction has a more significant relationship with the parties and their transaction than the state they choose, that jurisdiction has a materially greater interest than the chosen state, and the jurisdiction's fundamental policy would be contravened by the application of the law of the chosen state. *See* Restatement (Second) of Conflict of Laws ("Restatement") § 187; *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d at 705; *International Interests, L.P. v. Hardy*, 448 F.3d 303, 308 (5th Cir. 2006). To reject the parties' choice-of-law, each element of the Restatement's test must be met. *Mary Kay, Inc. v. Woolf*, 146 S.W.3d 813, 816-17 (Tex. App.—Dallas 2004, pet. denied). To understand whether a state has a more significant interest than the chosen state, the Restatement emphasizes several factors: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement §§ 6, 188(2); *Minnesota Mining & Manufacturing Co. v. Nishika, Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996); *DeSantis*, 793 S.W.2d at 678. These contacts are evaluated by their importance, not their number. *Minnesota Mining & Manufacturing Co.*, 955 S.W.2d at 856.

Here, Leslie signed the contract in Georgia. It does not appear that any negotiations took place. TransPerfect disclosed confidential information in both Georgia and Texas. TransPerfect is a New York Corporation, with its principal place of business in New York. Leslie arguably breached his contract by securing another job while he was

in Texas.[2]   During his time at TransPerfect, Leslie was a Georgia and then a Texas resident, although he has now moved to Chicago, Illinois.  Leslie worked in Georgia for 18 months and Texas for 11 months. He gained the most recent information regarding the sales of e-Learning products while in Texas.  In its Non-Compete Agreement, TransPerfect seems most concerned with protecting relationships with clients with which its employees had contact in the past year.  (Doc. No. 1, Ex. A, Ex. A ¶ 8(a).)

The balance of the Restatement factors does not indicate that Georgia has a more significant interest in enforcing a non-compete involving a recently-Texas, now-Illinois citizen and a New York company.[3]  *See DeSantis*, 793 S.W.2d at 679 (holding that where the "gist" of the agreement, including the non-compete, was the performance of services in Texas, the relationship of the parties to Texas was more significant). This case is distinguishable from others in which an employee who worked in multiple states, in addition to Texas, spent the large majority of his time working outside of Texas. *Maxxim Medical Inc. v. Michaelson*, 51 F.Supp.2d 773, 779 (S.D. Tex. 1999) (holding that California had a more significant interest in the litigation involving an employee who

---

[2] In the context of an indemnity clause of an oil-well operator's contract with a drilling contractor, a court held that the state with the most significant relationship should be determined by looking at the disputed clauses, rather than the contract as a whole. *See Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 171 (Tex. App.—Houston 2002, no pet.) (reasoning by analogy to choice of law in the tort context to find that the state's relationship was evaluated with respect to the substantive issue to be resolved). Similarly, here, where the alleged contractual breach arose in Texas (or in Illinois), this factor does not weigh in favor of Georgia.

[3] In addition to the contacts analysis, the Restatement test includes consideration of several principles. These principles include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. Restatement § 6. Texas has a strong interest in contractual freedom. *Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368, 371 (Tex. 2001). In addition, the Texas non-compete statute is designed to create incentives affecting the employees of the state of Texas. *DeSantis*, 793 S.W.2d at 679. The justified expectation of the parties, the policies underlying contracts, and certainty, predictability and uniformity suggest application of the law specified in the contract, here Texas law. *DeSantis* at 677; Restatement § 187 cmt. e. Finally, ease of determination and application of the law to be applied favors the law of the forum in which the plaintiff brought suit.

lived and worked for his employer in California and who supervised salesmen in many states, including Texas), *reversed and vacated on other grounds*, 183 F.3d 915 (5th Cir. 1999); *cf. Chase Manhattan Bank v. Greenbrier North Section II*, 835 S.W.2d 720, 726 (Tex. App.—Houston [1st Dist.] 1992, no writ) (holding that Texas did not have a more significant relationship and applying New York law as specified under the contract where the locations of the parties were split between two states, the property at issue was in Texas, the places of performance were mixed, negotiation occurred in New York, and the contract was executed in New York). *See also* Restatement § 188 cmt. e (the place of performance "can bear little weight on the choice of the applicable law when …. performance by a party is to be divided more or less equally among two or more states with different local rules").

The "materially greater interest" analysis appear to include some of the same factors of the contacts analysis of § 6, but also involves the policy behind the law at issue. *DeSantis*, 793 S.W.2d at 679 (holding that Texas has a materially greater interest in determining whether the non-compete is enforceable because the litigation involved a Texas resident who planned to start a competing business in Texas). Again, Texas has a strong interest in enforcing its residents' contracts and has an interest in TransPerfect as a national employer doing business in its state. *Id.* Under these factors, as before, while Georgia has some interest in a contract signed within its jurisdiction, it does not have a materially greater interest in the current litigation. *Baxter Inter. Inc. v. Morris*, 976 F.2d 1189 (8th Cir. 1992) (applying an Illinois law choice of law provision and holding that California did not have a materially greater interest than Illinois, even though the employee worked for the company in California, because the issue was a post-

employment non-compete, and the employee was now living in Missouri); *Chase Manhattan Bank*, 835 S.W.2d at 727 (holding that New York law was properly applied because the issue in the case reduced the importance of the Texas's interest in the case). As Georgia does not have a materially greater interest, regardless of whether the non-compete violates Georgia's fundamental public policy, Leslie last worked in Texas, and the Court will interpret the Agreement according to Texas law.[4]

### b. Preclusive effect of the Southern District of New York Opinion

Leslie argues that a Southern District of New York decision ("New York decision") invalidating a non-compete covenant based on the same TransPerfect contract language has a preclusive effect on the current litigation under the Texas collateral estoppel doctrine. TransPerfect responds that the New York opinion was based on now-overruled Texas law, and was not well supported under then-applicable Texas law such that application of collateral estoppel would be inappropriate.

A federal court looks to state law rules when determining the collateral estoppel effect of a state court judgment. *Matter of Garner*, 56 F.3d 677, 679 (5th Cir. 1995). "Under Texas law, collateral estoppel 'bars relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit, regardless of whether the second suit is based upon the same cause of action.'" *Id.* at 681 (citing *Bonniwell v.*

---

[4] The Court acknowledges that this is a close call. Under Restatement § 187, the focus of the public policy analysis is whether the courts of the state will refuse to enforce an agreement contrary to that law, and while the Court does not take a position on Georgia law, it is possible that the reformation remedy under Georgia and Texas law differ to the point that Georgia might nullify the entire covenant rather than reform it, as the Court does here, applying Texas law. *DeSantis* at 680 (noting that the focus of the § 187(2) analysis is whether the law in question is part of the state policy so fundamental that the courts of the state would refuse to enforce an agreement contrary to that law, even though the agreement would be enforceable in another state connected with the agreement); *Chase Manhattan Bank*, at 727 (same).

*Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984)).   In *Bonniwell*, the Texas

Supreme Court further explained:

> A party seeking to invoke the doctrine of collateral estoppel must establish (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.

663 S.W. 2d at 818.  Parties do not dispute that the New York decision meets prongs one

through three. TransPerfect claims that it would be unfair to apply collateral estoppel. *See*

*Sysco Food Services, Inc. v. Trapnell*, 890 S.W.2d 796, 804 (Tex. 1994) ("[a]pplication

of collateral estoppel also involves considerations of fairness not encompassed by the

'full and fair opportunity' inquiry" including broad principles of equity and justice).

In *TransPerfect Translations International, Inc. v. Merrill Corporation, et al.*, 03

Civ. 10146, 2004 WL 2725032 (S.D.N.Y. Nov. 29, 2004), the court ruled that

TransPerfect's alleged promise to provide confidential information was not a legal

promise. The court explained:

> these words simply describe the process by which [employee] would come into possession of the Confidential Information that forms the basis of the entire agreement. Moreover, the alleged promise by which TransPerfect claims to be bound appears under a heading specifically directing [employee], not TransPerfect, to acknowledge the obligations contained in the succeeding paragraphs. Given these facts, I simply cannot find that the parties intended, at the time of contracting, to require TransPerfect to provide [employee] with the very same Confidential Information it sought to protect.

*TransPerfect* at *10.

The court held that the same language regarding confidential information at issue

in the current litigation was not even an illusory promise. *Id.* The Second Circuit

affirmed, agreeing that the clauses in the Agreement covering confidential information

constituted "a mere acknowledgment of the circumstances of employment rather than as a promise by TransPerfect" because the consideration was the at-will employee's continued employment and the promise fell under the "Employee Acknowledges" subheading of the agreement. *Transperfect Translations Intern., Inc. v. Merrill Corp.*, 159 Fed. Appx. 313, 314, 2005 WL 3452448, *1 (2d Cir. 2005).

   To be enforceable under Texas law, a non-compete must be (i) ancillary to or part of an otherwise enforceable agreement at the time the agreement is made; (ii) to the extent it contains limitations as to time, geographical area, and scope of activity to be restrained, reasonable, and must not (iii) impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise. TEX. BUS. & COM. CODE § 15.50. In 2006, the Texas Supreme Court, interpreting element (i), held that non-compete covenants can be considered unilateral contracts, made at the time a non-compete is signed, that become binding once an employer provides the employee confidential information. *Sheshunoff Management Services, L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). *Sheshunoff* overruled the prevailing Texas Supreme Court decision interpreting § 15.50 to require that the non-compete covenant must be supported by a valid promise at the time the agreement is made. *Light v. Centel Cellular Co.*, 883 S.W.2d 642 (Tex. 1994).

   Leslie does not dispute that TransPerfect provided him some confidential information during his employment. (Leslie Dec. ¶ 4.) Instead, Leslie argues that, because the New York decision held that the TransPerfect non-compete was not even an illusory promise, the current non-compete is invalid, even under *Sheshunoff*. TransPerfect responds that *Sheshunoff* does not require any promise at the time of contracting. For the

following reasons, the Court agrees with TransPerfect that *Sheshunoff* renders the TransPerfect non-compete covenant enforceable as to prong (i) of § 15.50, and the New York litigation's factual finding with respect to TransPerfect's contractual promises does not preclude litigation in this case.

In *Electro-Motor, Inc. v. Industrial Apparatus Services, Inc.* 390 F.R.859 (Bankr. E.D. Tex. 2008), *Sheshunoff* was applied to hold that a non-compete covenant was enforceable even though the employer made no promise at the time of contracting. *Electro-Motor*, 2008 Bankr. LEXIS 2347, at \*16-\*17; *see also Ray Mart Inc. v. Stock Bldg. Supply of Texas LP*, No. 07-50609, 2008 WL 4809471, \*4 (5th Cir. 2008) (holding that employer's promise to employ employee for three years contained an implicit promise to provide confidential information). In fact, like the TransPerfect contract, the at-will employee only acknowledged that he would receive confidential information. *Electro-Motor*, 2008 Bankr. LEXIS 2347, at \*16-\*17. The New York holding that the TransPerfect non-compete covenant contained no promise is not fatal to its enforceability now. *Sheshunoff* read § 15.50 to apply to unilateral non-compete covenants and does not require that the employer make any sort of promise as long as it eventually provides consideration for the employee's covenant. *Sheshunoff*, 209 S.W.3d at 651, 655-56. One non-illusory promise may establish consideration for the agreement, *Curtis v. Ziff Energy*, 12 S.W.3d at 118, and here, Leslie made a non-illusory promise not to compete that was later accepted by TransPerfect. *Sheshunoff*, 209 S.W.3d at 649-650 (discussing *Light v. Cental Cellular Co.*, 883 S.W.2d 642,645 n.6 (Tex. 1997)). Consequently, regardless of the holding in the New York litigation, Leslie promised not to compete with TransPerfect

16

and TransPerfect provided consideration for this covenant to the extent it provided Leslie confidential information.

In addition, in order to satisfy element (i) of the § 15.50 test, the consideration must give rise to the employer's interest in restraining the employee from competing and must be designed to enforce the employee's return promise. *Sheshunoff*, 209 S.W.3d at 649. Here, TransPerfect's provision of confidential information gave rise to its interest in the Agreement's non-compete by providing Leslie with important business information that could be damaging to TransPerfect. Further, Leslie's covenant not to compete for one year post-employment is clearly designed to enforce his promise not to disclose confidential TransPerfect information to competitors. *See Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d at 118.

### c. Reasonableness and Appropriateness of Restraint

The next § 15.50 inquiry is whether the non-compete is reasonable in scope. TransPerfect's non-compete covenant requires Leslie to refrain from competing with the TransPerfect business in any activities involved in the provision of goods or services in competition with the business with respect to products and services that are competitive with the products and services of the TransPerfect Business. In geographic scope, the covenant extends to the states in which TransPerfect maintains U.S. Offices or the countries in which TransPerfect maintains foreign offices for one year following Leslie's separation from TransPerfect in November 2008.

Leslie argues that this covenant is unreasonable as to time, geographic scope, and range of activities given his primary role as a salesperson who had limited supervisory duties and limited access to confidential information. He claims he never worked for

TransPerfect in Illinois and never sold to a customer in Illinois. In addition, Leslie claims that a condition of his employment at Merrill is that he not use or disclose TransPerfect confidential information. TransPerfect responds that Leslie was a member of upper management with extensive nationwide contacts through his work at TransPerfect such that an internationally-applicable covenant is reasonable.

Business goodwill and confidential or proprietary information are interests worthy of protection by a non-compete. *See Sheshunoff*, 209 S.W.3d 644 at 649. In addition, knowledge of a unique customer base and knowledge of the equipment or products used by each of the employer's customers are also protectable interests. *See Stone v. Griffin Comm. & Security Systems, Inc.*, 53 S.W.3d 687, 694 (Tex. App.—Tyler 2001, no pet.). Likewise, information concerning acquisition strategies, compensation and benefits formulas, and payment rates may be considered protectable interests. *See Teel v. Hospital Partners of America, Inc.*, No. H-06-cv-3991, 2008 WL 346377, *7 (S.D. Tex. Feb. 6, 2008).

A reasonable geographic scope is generally considered to be the territory in which the employee worked for the employer. *See Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no writ). If the geographical scope of the non-compete is unreasonably large, the court must reform the contract so that it is enforceable. TEX. BUS. & COMM. CODE § 15.51(c); *Evans World Travel, Inc. v. Adams*, 978 S.W.2d 225 (Tex. App.—Texarkana 1998, pet. denied) (holding that the agreement was only enforceable in the one county in which employee worked for former employer); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 661-62 (Tex. App.—Dallas 1992, no pet.) (holding that a

non-compete that contained no geographical restriction was unenforceable, but declining to reform because the plaintiff had dropped injunctive relief claim).

Texas courts note that non-compete covenants that contain either an industry-wide exclusion from subsequent employment and/or that prevent contact with clients with whom the employee had no contact are unenforceable. *Peat Marwick Main & Co. v. Haas*, 818 S.W.2d 381, 386-87 (Tex. 1991) (holding that the accounting firm's protectable business interest was its client base, and the non-solicitation provision was unreasonable under § 15.50 because it applied to customers and territory with which the employer had not had actual contact); *Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc.*, 263 S.W.3d 232, 250 (Tex. App.—Houston 2007, pet. granted); *General Devices, Inc. v. Bacon*, 888 S.W.2d 497, 504 (Tex. App.—Dallas 1994, no writ) (non-compete was unreasonable where it contained no geographical or time limitation); *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston 1996, writ denied).

On the other hand, non-compete covenants with restrictions covering a wide geographic area may be reasonable if they are limited in scope to a firm's current or prospective clients such that they do not pose a greater restraint than necessary to protect the firm's goodwill. *See Sheshunoff* at 656-57 (holding that the non-compete was reasonable where employee could not contact any clients or prospective clients for one year because he was a high-level employee and could have otherwise capitalized on goodwill that he helped develop); *Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d at 119 (holding that six-month non-compete prohibiting a former vice-president from conducting competitive business in Canada and the United States was reasonable because the non-compete was limited to twenty competitors and employee worked within their

territory); *Webb v. Hartman Newspapers, Inc.*, 793 S.W.2d 302, 304-05 (Tex. App.—Houston 1990, no writ) (reforming the contract to prohibit former newspaper employee from soliciting advertising from clients of his former employer and to prohibit employee from competing in the distribution area of his former employer); *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 295 (5th Cir. 2004) (upholding a 10-year, national non-compete because former business owner advertised and sold products nationwide); *Staples, Inc. v. Sandler*, 2008 WL 4107656, *5 (N.D. Tex. 2008) (reforming a non-compete for a salesman to only prevent contact with clients on accounts that he developed at employer rather than all clients, including those he had before he joined the company); *American Express Financial Advisors, Inc. v. Scott*, 955 F. Supp. 688, 692 (N.D. Tex. 1996) (holding that a non-compete was reasonable, and not a greater restraint than necessary, where there was no explicit territorial limitation, but employee was prohibited from selling services to customers he served at his former employer or to potential customers) [5]; *W.R. Grace & Co. Dearborn Div. v. Mouyal*, 422 S.E.2d 52, 533 (Ga. 1992) (upholding non-compete covenant that had no geographical restriction but prohibited employee from contacting customers he contacted during the last two years of his tenure at employer).

In contrast, where an employee has no specialized training, has not acquired trade secrets, and does not have access to confidential customer lists, a non-compete is not necessary to protect the employer's business interests. *Daytona Group of Texas, Inc. v. Smith*, 800 S.W.2d 285, 289-90 (Tex. App.—Corpus Christi, 1990) (holding that non-compete was not necessary where salesperson for radio had no specialized knowledge

---

[5] The non-compete at issue defined customer as any person or entity who holds plaintiff's products, to whom plaintiff's representative has made a presentation or any person who is a member of a client's household. *American Express Financial Advisors, Inc.*, 955 F.Supp. at 692.

and radio's customers were public knowledge and she did not solicit them after leaving the station).

In this case, Leslie worked nationwide and occasionally internationally in his role as an e-Learning representative. He contacted prospective clients in Illinois even though he did not make a sale there. The Agreement prohibits Leslie from competing with TransPerfect in any activities involved in the provision of goods or services in competition with the business. (Doc. No. 1, Ex. A, Ex. A ¶ 8.) The terms of that clause are not defined. This Agreement is extremely broad in scope and prohibits competition in geographic areas where Leslie did not even attempt to make sales. The Court finds that this evidence suggests that the agreement is unreasonable in scope given that, based on the facts presented in the Preliminary Injunction Motion hearing, Leslie was not a member of upper management, but rather a fast-tracked salesman who had significant responsibilities in one core area, e-Learning. TransPerfect is a $200 million business with over 50 offices. To prohibit Leslie from competing with TransPerfect "in any activities" in all of the states and countries in which TransPerfect maintains offices, without evidence that Leslie solicited and won clients in all of these areas, in all of its business areas, is unreasonable in both geographic area and scope of activity at the preliminary injunction stage.[6]

Section 15.51 requires a court to reform a non-compete agreement if it is unreasonably broad in scope. TEX. BUS. & COMM. CODE §15.51(c). The court need not wait for the parties to request this remedy. *Compare Gomez & M.A.P.A., Inc. v. Zamora*, 814 S.W.3d 114, 118 (Tex. App.—Corpus Christi 1991, writ denied) (requiring a party to

---

[6] The temporary injunction analysis does not require the court to make a final determination of the ultimate enforceability of the contract. *See, e.g., Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 883 (Tex. App.—Dallas 2003, no pet.)

request reformation prior to the amendment of § 15.51 in 1993). Some Texas appeals courts have suggested, but not held, that reformation is appropriate at the temporary injunction stage. *See, e.g.*, *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 298-99 (Tex. App.—Beaumont 2004, no pet.) (vacating an overbroad injunction and declining to reform the non-compete because it determined that further factual information was required); *Poole v. U.S. Money Reserve, Inc.*, No. 09-08-137CV, 2008 WL 4735602 (Tex. App.—Beaumont Oct. 30, 2008) (mem. op., not designated for publication), *c.f.* *C.S.C.S., Inc. v. Carter*, 129 S.W.3d 584, 589 n.2 (Tex. App.—Dallas 2003, no pet.) (declining to decide whether reformation is appropriate at the temporary injunction stage); *McNeilus Companies, Inc. v. Sams*, 971 S.W.2d 507 (Tex. App.—Dallas 1997, no pet.) (holding that court had no jurisdiction to review decision not to reform the contract on an appeal from the temporary injunction). In light of this unsettled law, the Court will enter a limited injunction and reform the contract as necessary based on the current evidence, noting that any reformation or permanent injunction to be entered may differ from this temporary reformation based on arguments presented in the parties' dispositive motions or at trial.

TransPerfect has provided sufficient evidence that under the contract, as reformed consistent with § 15.50, it has a substantial likelihood of prevailing on the merits. Leslie has stated his intention to work for a direct competitor in the e-Learning business and to continue to pursue his sales in that market area. While at TransPerfect, Leslie had contact with potential clients in the United States, including some in Illinois, and abroad. He was one of a few TransPerfect employees trained to sell e-Learning, and in selling in this market area, Leslie had more responsibility than an average area salesman as evidenced

by his meetings with international clients. Consequently, it is likely that TransPerfect will be able to show that Leslie breached the non-compete as reformed to comply with § 15.51(c).

Pending dispositive motions or a trial on the merits, the Court will reform the non-compete covenant as follows. In place of the Agreement's provision 8(d), the Agreement shall read (in conjunction with ¶ 8(a)): "Customer shall be defined as any person or entity (or any person who is a member of that person's household) to whom Employee has made a presentation or to whom Employee sold or began the process of selling TransPerfect products or services while employed at TransPerfect." This amendment retains the Agreement's one-year limitation and the geographically extreme scope, but restricts the scope of the activities to reach only those customers to whom Leslie sold or attempted to sell, consistent with the scope of the good will TransPerfect stands to lose if the covenant is not enforced. In addition, the Agreement shall be amended to add a section 8(e) that reads: "Employee shall not participate in any way in the e-Learning market, including, but not limited to, the marketing, distribution, sales, and management of e-Learning products." This provision is intended to restore some of the scope of the former provision 8(d), but restrict it to the e-Learning market, the only market in which TransPerfect successfully demonstrated that it is likely to be able to show a protectable business interest worthy of restraint by an international covenant not to compete.

### 2. Substantial threat of irreparable injury

TransPerfect argues that it will suffer irreparable harm because of the loss of good will and customers and from the likely disclosure of confidential information that Leslie

acquired during his tenure at TransPerfect. The irreparable harm must be more than an unfounded fear, but need not be an existing injury—a strong threat of injury is sufficient.[7] *See U.S. v. Emerson*, 270 F.3d 203 (5th Cir. 2001) (citing WRIGHT & MILLER'S discussion of preliminary injunctions in the civil context); WRIGHT & MILLER 2D. § 2948.1 (2006). Likely economic injuries may support a finding of irreparable harm especially if the economic losses are difficult to quantify. *See Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989); *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d at 293 (upholding a temporary injunction where plaintiff presented testimony that the impact of an employee's use of confidential client information is difficult to quantify because it is impossible to ascertain when the client will be poached). The use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm. *See, e.g., Unisource Worldwide, Inc. v. Valenti*, 196 F.Supp.2d 269, 280 (E.D.N.Y. 2002); *Ecolab Inc. v. Paolo*, 753 F.Supp. 1000, 1110 (E.D.N.Y. 1991). Where there is a high degree of similarity between the employee's former and future employer, it becomes likely, although not certain, that the former's confidential information will be used and disclosed in the course of his work. *See, e.g., PepsiCo, Inc. v. Redmond*, 53 F.3d 1262, 1270 (7th Cir. 1995) (holding that where employer has demonstrated it will be difficult for employee to compartmentalize his knowledge, it is likely that employee's knowledge gained at the former employer will allow him an unfair advantage in making strategic decisions at his

---

[7] The Texas non-compete statute does not preempt the common law requirements for establishing a temporary injunction. *See Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 241 (Tex. App.—Houston 2003, no pet.); *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 293 n.1 (Tex. App.—Beaumont 2004, no pet.) (noting its agreement with *Bowen*).

new employer); *Minnesota Mining and Mfg. Co. v. Francavilla*, 191 F.Supp.2d 270, 278 (D. Conn. 2002).

Here, Leslie has intimate knowledge of TransPerfect's e-Learning business strategies and clients. It seems unlikely he will be able to cabin this knowledge such that he will not make decisions and sales influenced by the information gained at TransPerfect. The loss of good will and customers is generally considered an unquantifiable risk and appears to be so in this context as well because it is difficult to know how many former TransPerfect clients Leslie might be able to solicit in his e-Learning and other business at Merrill. In light of the potential threat from Leslie working at a direct competitor and using his knowledge of the strategy and marketing of e-Learning, the Court finds that TransPerfect has established irreparable harm as to the reformed covenant.

### 3. Defendant's Injury Outweighs the Threatened Harm

Any potential injury to Leslie will be minimal. He will still be able to earn a living at his current employer in his chosen city. In securing his employment with Merrill, Merrill allegedly forbid Leslie from using or disclosing any confidential business information that he obtained during his time at TransPerfect. (Leslie Dec. ¶ 7.) Leslie claims that he is already willing not to contact any customer or prospective customer with whom he dealt while employed at TransPerfect or work on Merrill's e-Learning business, pending further Order of the Court. (Leslie Dec. ¶ 8.) This Order will require Leslie to make good on his promises to Merrill and to TransPerfect, but as Leslie has acknowledged in making these commitments, will not prevent him from working.

### 4. The Public Interest

Granting the preliminary injunction in this case will not disserve the public interest. Leslie will be able to continue working in his chosen field and earn his living at his new job, but with respect for his commitment to TransPerfect. TransPerfect will retain the security that its confidential information will not be disclosed and its good will squandered. Further, Texas has clarified the public interest through its non-compete statute, and, under that statute, enforcing reasonable non-compete agreements is within the public interest.

## III. CONCLUSION

In light of the foregoing analysis of the temporary injunction factors, Plaintiff's application for a temporary injunction is **GRANTED IN PART** consistent with the reformed contract as specified. Pursuant to FED. R. CIV. P. 65(c), Plaintiff is required to post a $200,000 bond.

Leslie shall not contact any of TransPerfect's customers as defined by the reformed Agreement. Leslie shall not solicit employees away from TransPerfect. Leslie shall not participate in the e-Learning market while working at Merrill, or any other TransPerfect competitor, until the Court's ruling on dispositive motions in this case, a jury verdict, or until November 2009, the expiration of the non-compete covenant. As he has agreed in his employment arrangement with Merrill, Leslie is ordered not to disclose or use any confidential information that he obtained while working at TransPerfect.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 12 day of January, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

26

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**